**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **CLAIRE HARIJAN** | * |
| **13 Broomhaugh Close** | |
| **Hexham** | * |
| **Northumberland** | |
| **NE46 1DS** | * |
| **England** | |
| **United Kingdom** | * |
| | |
| **Petitioner,** | * |
| | **Civil No.:** |
| **v.** | * |
| | |
| **HAWAZIN HARIJAN** | * |
| **634 32nd Street** | |
| **West Palm Beach, Florida 33407** | * |
| | |
| **Respondent.** | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**VERIFIED PETITION FOR RETURN OF CHILD TO ENGLAND**
**AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER**

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

**INTRODUCTION**

1.      Petitioner, Claire Harijan (the "Mother"), by and through her undersigned *pro bono* attorneys, files this Verified Petition for Return of Child to England (hereinafter "Petition"), against the Respondent, Hawazin Harijan (the "Father").

2.      The Petition is filed as a result of the Father's wrongful retention in the United States of the parties' daughter R.B.H. (the "child"), born in 2005, from the child's proper custody and habitual residence jurisdiction of England. The wrongful retention occurred on January 8, 2018.

3. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

4. The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and the United Kingdom, which includes England, on July 1, 1988.[3]

5. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## JURISDICTION

6. This Court has jurisdiction under ICARA § 9003 because this case involves the wrongful retention of a child under the age of sixteen in the United States from the child's habitual residence of England, and the child is currently located within the jurisdiction of this Court in the Southern District of Florida.

## FACTS

7. The Mother is a citizen of the United Kingdom and has lived there with her children uninterrupted for nearly six years.

8. Upon information and belief, the Father is a citizen of the United States.

---

[1] .I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction   (last   accessed March 22, 2018).
[2] 22 U.S.C. 9001 *et seq.* (2017).
[3] *See* Hague Abduction Convention Country List, text available at:
https://travel.state.gov/content/childabduction/en/country/hague-party-countries.html (last accessed March 22, 2018).

9.      The parties met in Mexico in 1999. While the parties were in Mexico, the Mother became pregnant.

10.      In early 2000, the parties obtained a visa for the Mother to enter the United States. The parties then moved to New York.

11.      On August 14, 2000, the parties married in New York.

12.      On November 12, 2000, the parties' first child was born in New York.

13.      After the parties' marriage and the birth of their first child, the Mother sought and obtained residence status in the United States. The Mother held her residence status from December 19, 2000 until October 2012, at which time she returned to the United Kingdom. The Mother's residence card expired on April 23, 2014 and she has not sought any renewal.

14.      The parties are the parents of two children together. Their first child together is C.L.H., born in 2000, who is not the subject of this Petition[4] (the "parties' son"). The parties' son is currently living by agreement of the parties with the Mother in England. The parties are also the parents of a second child, R.B.H., born on September 19, 2005, who is the subject of this Petition (the "child") (collectively the "children").The child was also living by agreement of the parties with the Mother in England.

15.      The Mother and the Father are both named on the child's birth certificate.

16.      Both children have dual citizenship in the United Kingdom and the United States.

17.      The Mother also has two younger children from a separate relationship. The Mother's younger children were born in 2014 and 2016. They were born in England, they are currently living in England, and they have always lived in England with the Mother and their half-siblings.  They are not the subject of this Petition.

---

[4] The parties' son is seventeen years old and is not subject to the Hague Convention.

18.     After the parties' marriage and the birth of their two children, the parties and children lived together as a family in New York. But the family life from the outset was rife with marital discord as a result of the Father's maltreatment of the Mother.

19.     The parties agreed that the Mother would primarily raise the children while the Father pursued his education. The Mother worked as a waitress and a nanny during the marriage to support the family while the Father gained a degree in teaching.

20.     In July 2011, after many years of marital discord, the parties decided to separate. In order to escape the Father's abusive and controlling behaviors, the Mother left the marital home with the children. The Mother continued as the children's primary caretaker. The children would visit with the Father as agreed between the parties. But the Father continued to abuse and control the Mother even after she left the marital home.

21.     As a result of the years of abuse throughout the marriage and the continuing threats from the Father to take the children from the Mother if she did not return to the family home and the marriage, the Mother was mentally and emotionally drained.

22.     In early 2012, the Mother voluntarily admitted herself to hospital on several occasions to help her cope. While the Mother was in the hospital, the children stayed with the Father. During this time, the Father initiated a custody case against the Mother in New York. The Father thereafter began to deny the Mother access to the children.

23.     The Mother did not have any family or friends in the United States. She lost her home in New York while she was in the hospital. She lost her employment too. She depended upon family in England to financially support her. All of her support network was in the United Kingdom.

24.     During this very difficult time, the Father took and hid the Mother's United Kingdom passport from her so that she could not leave the United States and return to the United Kingdom. The Mother ultimately obtained an emergency passport from her home country. After many months of litigation and the Father's continuous abuse against the Mother, the Mother returned to England in July 2012. The children remained in the Father's care in New York.

25.     In September 2012, the Mother returned to the United States to visit with the children for three weeks. During the Mother's visit, the parties negotiated a "Stipulation and Agreement Regarding Custody" that was signed on September 28, 2012 ("custody agreement").

26.     The custody agreement gave the Father primary physical custody of the children and the Mother rights of access in England for an eight-week period during the summer. The custody agreement further provided that if either party sought to remove the children from New York that he or she was required to obtain consent from the other party or judicial authorization.

27.     The custody agreement was entered on October 30, 2012 in the Family Court for Warren County, New York.

28.     Almost immediately after the entry of the parties' custody agreement, the Father decided that he wanted to move to Mexico to live with his mother and to pursue surfing. The parties did not agree for the children to relocate to Mexico with the Father. And the Father by his own admission could not financially afford to care for the children in Mexico.

29.     The parties therefore agreed that the children would relocate from New York to England to live with the Mother.

30.     In November 2012, pursuant to the parties' express and shared agreement, the Father brought the children to England to live with the Mother. After delivering the children to the Mother in England, the Father returned to the United States. Soon thereafter, the Father

relocated to Mexico, and, upon information and belief, Mexico is where he lived for the next five years. The children have continued to live in England and have not left since they relocated there until the Father's wrongful retention on January 8, 2018.

31.     The parties have never modified their shared intent for the children to live and to reside in England with the Mother.

32.     After the parties separated and the children relocated to England to live with the Mother, the Mother encouraged the Father and children to have a meaningful relationship with each other, and always ensured that the children talked to and visited the Father in England.

33.     Every year from the parties' separation until the wrongful retention, on dates mutually agreed between the parties, the Father would visit with the children in England for a two-week period during the summer. The Mother would arrange temporary accommodations for the Father to facilitate the visits in England. Mostly, the Mother's family or friends would offer their homes to the Father and the children during the Father's visit in England.

34.     At the end of each agreed-upon visitation period, the children would always remain in England living with the Mother and the Father would return to his home either in Mexico or the United States.

35.     After the visit in England during the summer of 2016, the Father moved from Mexico to Florida.

36.     Instead of the Father's usual two-week summer visit in England, during the summer of 2017 the Father requested that the children travel to Florida to visit with the Father at his new home and to meet his partner.

37.     The parties agreed that the children would visit with the Father in Florida during the winter holiday break from December 22, 2017 and return to England on January 8, 2018. The

Father confirmed in writing the agreed-upon travel dates to the Mother's English solicitor on December 7, 2017. The Father booked roundtrip airline tickets for the children.

38.     The parties specifically selected and expressly agreed on the visitation dates to ensure that the children would return home to England after the winter holiday with minimal interruption to their school routine.

39.     Prior to the visit in Florida, the parties' daughter expressed significant hesitation about the upcoming planned visit. The daughter expressed to the Father that she did not want to go to Florida. The Father responded by text message to the daughter very aggressively and inappropriately for a twelve-year-old child. Upon information and belief, the Father made the daughter feel guilty and provided an ultimatum to the daughter.

40.     The daughter thereafter reluctantly agreed to the short two-week visit with her Father in Florida.

41.     In order to travel to the United States, the children required both their United States passports and their United Kingdom passports. The children's United States passports had recently expired just prior to the visit. The parties therefore cooperated to obtain emergency temporary United States passports effective for a period of three months. The emergency passports were issued on December 19, 2017 in light of the immediate travel dates. The parties intended to replace the children's emergency passports with regular passports after the travel was completed and they had returned to England. The emergency passports have since expired.

42.     On December 23, 2017, the children arrived in the United States for the agreed two-week visit.

43.     During the visit, the Mother had regular contact with the children by telephone or video.

44.     On January 3, 2018, the Father informed the Mother that he had unilaterally decided to keep the daughter with him in Florida, and that the child would not be returning to England as agreed between the parties.

45.     In accordance with the roundtrip airline tickets and the express agreement of the parties, the children were scheduled to depart from Florida on January 7, 2018 and return to England on January 8, 2018.

46.     On January 8, 2018, the parties' daughter did not return to England. The parties' son returned to England on the scheduled return flight.

47.     The Mother repeatedly tried to reach the Father directly in an effort to resolve the matter relating to their daughter's return, and to have the Father return the child home to England without the need for any court or law enforcement involvement.

48.     Prior to the visit, the Mother had commenced divorce proceedings in England. The Father was made aware of the proceedings because he was in communication directly with the Mother's English solicitor to agree upon the dates for the two-week visit. The Father withheld contact for the Mother unless the Mother succumbed to his demands to sign and to submit the necessary paperwork to finalize the parties' divorce. The Father threatened the Mother with ultimatums to coerce her to sign the paperwork.

49.     The Father is employed as a teacher at the Odyssey Middle School in Palm Beach County, Florida. Upon information and belief, the Father unilaterally enrolled the daughter into the Odyssey Middle School.

50.     The parties never had a shared intent for the child to live anywhere other than England. The parties' only shared, settled intent with respect to the child's habitual residence has been that the child will reside in England with the Mother.

51.     The Mother has never consented to the child living anywhere other than England.

52.     The Mother has not acquiesced in the Father's wrongful retention of the child in the United States from England.

53.     The child has been fully involved and integrated in all aspects of daily and cultural life in England. The child lives with her Mother, her brother, and her half-siblings in England, and has extended family and friends in England. The child attends a government-approved home school through the Department for Children, Schools and Families in England, has a pediatrician in England, has a United Kingdom passport, and participates in many extracurricular activities in England.

54.     At the time of the Father's wrongful retention of the child on January 8, 2018, the Mother had (and continues to have) rights of custody to the child in England, by operation of English law, as fully set forth below.

55.     On January 30, 2018, the Mother promptly submitted her Hague Convention Return Application ("Hague Application") to the United Kingdom Central Authority, which transmitted the Hague Application to the United States Department of State Office of Children's Issues (the "United States Central Authority").

56.     The Mother promptly applied for and has now been able to find and retain *pro bono* representation in seeking the return of the child to England.

## COUNT I – WRONGFUL RETENTION

57.     The Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the children.

58.     The child in this case is under the age of 16.

59.     The habitual residence of the child is England. The child is fully involved in all aspects of daily family life and cultural life in England. The parents last shared and settled intent was for the child to live in England. Since the parties' agreement, the child has lived in England with the Mother.

60.     The parties never had a shared agreement for the child to remain in the United States after the two-week visit with the Father.

61.     At the time the Father wrongfully retained the child in the United States, the Mother had (and continues to have) rights of custody to the child under English law by operation of law and under the Children Act 1989.

62.     Notice is given in this pleading that the Mother is relying upon foreign law. Fed.R.Civ.P. 44.1.

63.     Part 1, Section 3(1) of the Children Act 1989 defines "parental responsibility" as "all the rights, duties, powers, responsibilities and authority which by law the parents of a child have in relation to the child and his property."

64.     The Children Act 1989, Part 1, Section 2 provides that "[w]here a child's father and mother were married to each other at the time of his birth, they shall each have parental responsibility for the child."

65.     The rights and responsibilities of a person entitled to parental responsibility under English law necessarily involve the "care of the child" and is therefore a right of custody under Article 5a of the Hague Convention.[5] [6]

---

[5] *See, e.g., Hanley v. Roy*, 485 F.3d 641, 647–48 (11th Cir. 2007).
[6] A right of custody pursuant to the Hague Convention may be held either jointly or alone.  *See* 51 Fed. Reg. 10,494, 10,504 (1988) (legal analysis of the Hague Convention by the U.S. Department of State).

66.     The parties were married at the time of the child's birth. The Mother here therefore has joint parental responsibility for the child as defined by the Children Act 1989. She has this right by operation of law and pursuant to the parties' agreement even without any orders being entered related to the child by any courts of the United Kingdom, and she had this right at the time the Father retained the child in Florida from England.

67.     The Mother here, as the holder of parental responsibility over the child, never agreed for the Father to retain the child in the United States permanently or indefinitely. She never agreed for the child to be kept outside England after January 8, 2018.

68.     At the time of the Father's wrongful retention of the child, the Mother was actually exercising her custody rights within the meaning of Articles 3 and 5*a* of the Convention by caring for the child, fully participating in the child's life, and undertaking all parenting responsibilities since the child was born.

69.     The Mother has requested the return of the child to England by submitting an Application for Return with the Central Authority for England and Wales.

70.     The Mother has never acquiesced or consented to the retention of the child in United States from England.

71.     The Father's wrongful retention of the child in the United States, and his unilateral decision and declaration that he will not return the child to her habitual residence of England, is in breach of the Mother's rights of custody under English law.

72.     The Mother has promptly taken all legal steps available to her to seek the return of the child to England in accordance with the Hague Convention.

73.     The child is currently physically located within the Southern District of Florida at 634 32nd Street, West Palm Beach, Florida 33407.

## COUNT II – ARTICLE 18 RETURN

74.     The Mother invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.[7]

## PROVISIONAL AND EMERGENCY REMEDIES[8]

75.     Simultaneously with the filing of this Petition, the Mother files a Request to Expedite Proceedings and Issue Show Cause Order Pursuant to Hague Convention Law.

76.     The Mother requests that this Court issue a Show Cause Order forthwith[9] due to the expedited nature of this child abduction case and pursuant to the Hague Convention, the mandate of the United States Supreme Court, the implementing statute and relevant Eleventh Circuit authority.

77.     The Father has demonstrated that he is a substantial flight risk, having already cut off contact between the Mother and the child and unilaterally announcing that he is keeping the child in the United States from her home in England.

78.     The Father clearly has the resources and ability to flee with the child outside of the United States or to a different state outside of this Court's jurisdiction. The Father's flight risk is aggravated by the fact that he has family in Mexico and had resided in Mexico for the past five years.

79.     During the limited contact that the Father has allowed the Mother with the daughter, the daughter has made statements about her well-being in the Father's care that gravely

---

[7] *See* Convention, art. 18; *see also* 51 Fed. Reg. 10,494, 10,509 (1988) (legal analysis of the Hague Convention by the U.S. Department of State); *In re B. Del C. S. B.*, 559 F.3d 999, 1015-16 (9th Cir. 2009); *Alcala v. Hernandez*, 826 F. 3d 161 (4th Cir. 2016).

[8] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

[9] Such an approach is consistent with the approach of other district courts faced with equivalent concerns regarding the flight of a respondent following service of a petition for return under the Convention. See *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1343 (S.D. Fla. 2002).

concern the Mother. Upon information and belief, the child desperately wishes to return home to England.

80.     Unless this Court takes immediate action to issue a Show Cause Order, and then bring the Father and the child before the Court, irreparable harm will occur to the well-being of the child in that she will be deprived of her Mother, her home, and her life in England.

81.     The Mother therefore requests that the Court issue a Show Cause Order forthwith ordering the appearance of the Father and child before this Court on the first available date on the Court's calendar, and directing the United States Marshal to serve the Show Cause Order on the Father forthwith.[10] The Court will then be able to confirm the exact whereabouts of the child in Florida as required by ICARA § 9003(b).

82.      Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied."  ICARA § 9004.  In this case, the law referred to is that of Florida.

83.     In Florida, the Uniform Child Custody Jurisdiction and Enforcement Act (hereinafter "UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as Fla. Stat. § 61.501 *et seq*.

84.     Florida law addresses the appearance of the parties and the child in such cases in § 61.523 of the UCCJEA.  That section authorizes this Court to order the appearance of the child and custodian or custodians *together*.  *Id.*  This Court therefore has the authority to issue a show

---

[10] A Petition may also be treated as an application for a Writ of Habeas Corpus itself.  *Zajaczkowski v. Zajaczkowska*, 932 F. Supp. 128, 132 (D.Md. 1996) ("[T]he Court will treat the [Convention] petition as an application for a writ of habeas corpus . . . pursuant to 28 U.S.C.A. § 2243").

cause order, ordering the appearance of the Father and child in that the provisions of 22 U.S.C. § 9004 can be met.

85.     The Mother further requests that this Court order, as a part of the Show Cause Order, a provision prohibiting either party from removing the child from the jurisdiction of this Court during the pendency of the proceedings in this Court, taking into possession all of the child's travel documents, and thereafter issuing a Scheduling Order setting an expedited hearing on the Verified Petition for Return of Child to England.

86.     The Mother does not have the financial resources to travel to the United States for both the Show Cause hearing and the evidentiary hearing because she lacks the funds to do so and because she is the primary caretaker for two young children, the child's half-siblings.

87.     The Mother requests that her appearance be excused for the initial Show Cause hearing. The Mother's counsel will appear on her behalf at the Show Cause Hearing, and will have full authority to schedule all further hearings and deadlines in this case.

88.     Depending on her finances and child care issues, the Mother may need to file at the appropriate time a "Motion for Testimony by Contemporaneous Transmission" seeking permission of this Court to testify by contemporaneous transmission at the evidentiary hearing.

89.     In accordance with the Hague Convention Articles 2 and 11, ICARA, 28 U.S.C. § 1657, the requirement of the Supreme Court of the United States that courts use the most expeditious procedures available, this Court's internal operating procedures[11], and the good and meritorious cause to expedite consideration of the Mother's Petition, this Court should enter a Show Cause Order forthwith in the form submitted to this Court, setting a date for the Father to

---

[11] This Court's Internal Operating Procedure 2.18.00 requires expedited review of Petitions filed under the Hague Convention.

14

appear with the child, on the first date available on the Court's calendar, and thereafter allowing for full resolution of this matter within six weeks of the date of filing this Petition.

## UCCJEA DECLARATION

90.     The details regarding the minor child that are required to be provided under the UCCJEA are as follows:

a   The child has been physically located at the following address, with the Father and his partner, from December 23, 2017 until January 8, 2018 by agreement of the parties, and from January 8, 2018 to present as a result of the Father's wrongful retention of the child: 634 32nd Street, West Palm Beach, Florida 33407.

b   For the past five years, the child resided with the Mother, her brother, and her half-siblings at 13 Broomhaugh Close, Hexham, Northumberland, NE46 1DS, England, United Kingdom.

c   The Mother does not have information of any custody proceeding concerning the child pending in any other court of this or any other State, except as set forth in this Petition.

d   The Mother does not know of any person, or institution, not a party to the proceedings, which has physical custody of the child or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the child.

## NOTICE OF HEARING

91.     Pursuant to ICARA § 9003(c), the Father will be given notice of any hearing in accordance with §§ 61.509, 61.518 of the UCCJEA.[12]

## ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

92.     The Mother has incurred significant expenses as a result of the wrongful retention of the child by the Father. The Mother will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of the Father's wrongful retention.

93.     The Mother respectfully requests that this Court award all reasonable and necessary expenses and attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

## RELIEF REQUESTED

**WHEREFORE**, Petitioner, Claire Harijan, respectfully requests the following relief:

A. That this Court issue an Order directing the prompt return of the child to her habitual residence of England in accordance with Petitioner's rights of custody under English law and Articles 3, 5*a* and 18 of the Convention; and

B. That this Court issue a Show Cause Order forthwith, scheduling an initial show cause and scheduling hearing on the first available date on the Court's calendar, and requiring the Respondent to appear in person with the child at the show cause and scheduling hearing to confirm that the child is physically located within this Court's jurisdiction;

---

[12] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

C.   That this Court's Show Cause Order also include a provision ordering that neither party may remove the child from this Court's jurisdiction during the pendency of these proceedings, and taking into the Court's possession all of the child's passports and any other travel documents;

D.   That this Court's Show Cause Order be served on the Respondent by the United States Marshal Service;

E.   That this Court excuse the appearance of the Petitioner at the initial Show Cause Hearing as long as the Petitioner's counsel appears on her behalf and has full authority from the Petitioner to schedule an expedited evidentiary hearing and all related deadlines;

F.   That this Court order electronic access for the Petitioner with the child during the pendency of these proceedings and in-person access if she is able to travel to the United States for these proceedings;

G.   That if the Respondent fails to appear pursuant to this Court's Show Cause Order, that this Court issue an Order directing that the name of the child be entered into the national police computer system (N.C.I.C.) missing persons section and that an arrest warrant be issued for the Respondent;

H.   That this Court issue an Order directing the Respondent to pay the Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

I.   That this Court grant any such further relief as justice and the Petitioner's cause may require.

## VERIFICATION

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

_____   March 22, 2018
Claire Harijan            Date
*Petitioner*

Respectfully submitted this 22nd day of March, 2018.

/s/ Brett A. Barfield
Brett A. Barfield
Florida Bar No. 192252
HOLLAND & KNIGHT LLP
701 Brickell Ave., Suite 3300
Miami, Florida  33131
(305) 374-8500
(305) 789-7799 (fax)
brett.barfield@hklaw.com


/s/ Leah M. Hauser
Leah M. Hauser
Florida Bar No. 1002771
MILES & STOCKBRIDGE P.C.
1500 K Street N.W.
Suite 800
Washington, D.C. 20005
(202) 465-8418
(202) 640-6012 (e-fax)
LHauser@milesstockbridge.com

*Pro Bono Attorneys for Petitioner*